# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## TEXARKANA DIVISION

**OAK CREEK INVESTMENT PROPERTIES, INC.**                      **PLAINTIFF**

**V.**                           **CASE NO. 4:18-CV-4009**

**AMERICAN ELECTRICAL POWER SERVICE**
**CORPORATION; KMT GROUP, INC.; and**
**CLEAResult CONSULTING, INC.**                            **DEFENDANTS**

**AND**

**KMT GROUP, INC.**                                **THIRD-PARTY PLAINTIFF**

**V.**

**JIMMY HICKEY and RICHARD SMITH**          **THIRD-PARTY DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Currently before the Court is Separate Defendant CLEAResult Consulting, Inc.'s ("CLEAResult") Motion for Partial Summary Judgment (Doc. 79), which is fully briefed and ripe for decision. The Motion is **GRANTED IN PART AND DENIED IN PART.** First, the Court dismisses Plaintiff's breach of contract claim against CLEAResult. Second, the Court finds, as a matter of law, that the Plaintiff's mobile homes are not items of personal property, but rather improvements to real property. Given this finding, the Court further determines the proper measure of Plaintiff's damages for any negligent injuries to its mobile homes.

## I. BACKGROUND

In 2002 Jimmy Hickey and Richard Smith formed a corporation, Oak Creek Investment Properties, Inc.'s ("Oak Creek"), through which they purchased 12.5 acres of pastureland in Texarkana, Arkansas. (Doc. 88-1, pp. 1–2). The pair then developed a

1

platted mobile home neighborhood that they named Oak Creek Manufactured Home Park. They installed underground utilities, asphalt streets, and built driveways to each of the park's 62 mobile home sites. *Id.* Oak Creek then began purchasing used mobile homes—mostly from the Dallas, Texas area—at an average price of approximately \$8,000.00. (Doc. 81, ¶ 7). The mobile homes were transported to Texarkana and physically affixed to each of the 62 lots by removing the wheels, axles, and tongues. When the development was complete, Oak Creek began leasing the homes to its tenants. Oak Creek has owned and operated the mobile home park ever since. (Doc. 88-1, p. 2).

Sometime in 2014, representatives of Separate Defendant KMT Group, Inc. ("KMT") approached Oak Creek and pitched the idea of "weatherizing" its mobile homes. The objective was to make the mobile home units more energy efficient, which in turn would lead to energy-cost savings. KMT explained that it had partnered with Separate Defendants CLEAResult—the designer of the weatherization program—and American Electrical Power Service Corporation ("AEP-SWEPCO")—the provider of electric power to Oak Creek's mobile home park—to perform the contracting work necessary to weatherize the mobile homes. KMT would perform the labor and AEP-SWEPCO would reimburse KMT for its costs after the work was completed. The "weatherization program" was thus a free service offered to Oak Creek. (Doc. 36, p. 2).

Initially, Oak Creek was not interested in the program. But KMT "persisted in offering its services," and sometime in December of 2015, Oak Creek reconsidered and approved the project. *Id.* However, in Oak Creek's view, once the work was completed, "it became apparent KMT failed to properly perform the weatherization program in the mobile homes." *Id.* at 3. Oak Creek "began noticing various issues with the interiors of

mobile homes . . . including, but not limited to[,] warped and cracked sub-flooring and flooring." *Id.* Oak Creek believes that CLEAResult's weatherization program was never intended to be used on mobile homes, and that Defendants either knew or should have known this before any of the work commenced. *Id.* at 3–4.

Oak Creek claims to have been damaged by the weatherization program and asserts the following causes of action: (1) breach of contract arising from Oak Creek's third-party beneficiary status for contracts between the Defendants; (2) negligence; (3) deceit; (4) violations of the Texas Deceptive Trade Practices Act; and (5) violations of the Arkansas Deceptive Trade Practices Act. (Doc. 36).

Regarding the negligence claims, Oak Creek alleges that it "suffered physical damage to its mobile homes." *Id.* at 8, 10. Oak Creek claims that such negligence has caused, among other things, a "loss of income and loss of profits," and "greatly reduced the fair market value of [Oak Creek's] real property, [which] prevents it from being able to sell it as an ongoing and viable business," *Id.* at 8–9. Oak Creek "expects that it will experience future loss of income, loss of profit, . . . and loss of value of the mobile home park as a going business concern." *Id.* at 9.

In its Amended Complaint, Oak Creek asserts that the legal measure of its damages depends on whether the mobile homes are characterized as real property or personal property, and whether the injury is determined to be permanent or temporary. For example, according to Oak Creek:

- If the mobile homes are **Real Property** and the injury is **Permanent**:
    - o Then Oak Creek seeks replacement costs for all 62 mobile homes, plus loss of use damages. According to Oak Creek, the

3

"replacement cost" for all mobile homes is necessary to "restore the fair market value of its mobile home park as an ongoing business concern." (Doc. 36, ¶ 5.2).

- o In the alternative, Oak Creek seeks damages equal to the difference in the fair market value of its Real Property (including the value of the mobile homes), as measured immediately prior to and after the injury, plus loss of use damages. *Id.*

- If the mobile homes are **Real Property** and the injury is **Temporary**:

  - o Then Oak Creek seeks damages equal to the cost to repair and restore the mobile homes to their pre-injury condition. *Id.* at ¶ 5.3.

- If the mobile homes are **Personal Property** and the injury is **Permanent**:

  - o Then Oak Creek seeks damages equal to the fair market value of the mobile homes immediately prior to the injury. *Id.* at ¶ 5.4.

  - o In the alternative, Oak Creek seeks damages equal to the replacement cost of the mobile homes. *Id.*

- If the mobile homes are **Personal Property** and the injury is **Temporary**:

  - o Then Oak Creek seeks damages equal to the difference in the fair market value of the mobile homes immediately prior to and after the injury. *Id.* at ¶ 5.5.

  - o In the alternative, Oak Creek seeks damages for the cost to repair and restore the mobile homes to their pre-injury condition. *Id.*

Against this background, "CLEAResult moves for partial summary judgment on [Oak Creek's] measure of damages for its negligence claim and substantively on [Oak

4

Creek's] breach of contract claim." (Doc. 79). In its response, Oak Creek concedes that its breach of contract action against CLEAResult should be dismissed, and therefore partial summary judgment is **GRANTED** as to that claim. Below, after summarizing the applicable legal standards, the Court will take up the parties' respective arguments with respect to the proper measure of Oak Creek's damages for its negligence claims.

## II. LEGAL STANDARD

### A. Summary Judgment

The standard for summary judgment is well established. Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir.

5

2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, in order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). To meet its burden, "[t]he nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## B. Property Damage

The parties' briefing correctly explains that the proper measure of "property damage" is initially dependent on whether the injury harmed *real* property or *personal* property. The remedy for injury to real property, however, is further differentiated based on whether the injury is to the *land* or an *improvement* upon the land. Similarly, the remedies for injury to personal property can differ based on the specific nature of the chattel.

In recognizing these distinctions, Professor Howard Brill concisely summarizes the case law in Arkansas as follows:

> When land is negligently damaged, the initial question is whether the injury is permanent or temporary. Early case law stated that if the value of the property destroyed depends upon its connection with the soil, the damage is treated as permanent. For permanent damage to real property, the measure of general damages is the difference in fair market value immediately before and immediately after the occurrence. This measure has been applied to situations ranging from the overflow or diversion of a stream, to the destruction of growing trees, and to the loss of topsoil through

6

water drainage. Particularly today, these types of damages should arguably
be treated as temporary damages, because they may be reversible. Even
the deposit of toxic wastes upon land may be correctable with modern
techniques.

On the other hand, if the damage to the property is temporary, general
damages are assessed as the reasonable expense of necessary repairs.
That measure has been applied to the cost of restoring a bridge, cleaning a
pond, reseeding a meadow, repaving a parking lot, replacing topsoil and
other land cover, and remedying groundwater and soil contamination. The
objective is to provide the funds to restore the property to its condition prior
to the injury.

Brill and Brill, 1 *Arkansas Practice Series: Law of Damages* § 30:1 (6th ed.).

Pointing to other Arkansas cases, Professor Brill illustrates the importance of

distinguishing injuries to *land* fromh injuries to *improvements* upon the land:

When improvements to the land are destroyed, the proper measure of
recovery is the replacement value of the improvements, at least when the
property destroyed can be replaced in substantially the same condition. The
age, condition, and depreciated value of the destroyed building must be
considered. For example, the measure of damages for destruction of a
fence is not the total cost of replacement; rather, it is the cost of replacement
of the fence in substantially the same condition that existed when destroyed,
that is, an old fence. Appropriate depreciation methods may be employed
to measure the difference in value between the former aged improvement
and the new replacement.

If the improvements to the land are not destroyed but only damaged, the
plaintiff is entitled to the costs of restoration, assuming the property can be
restored to substantially the same condition it was in immediately before the
damage occurred. No Arkansas law discusses whether there is a cap on
the amount of repairs; that is, whether an award in excess of the original
value of the improvement would be an economic waste. Repair costs are
particularly appropriate when the owner has a personal reason, as opposed
to a merely commercial objective, for the restoration of the improvements.
. . . .

The owner is also entitled to compensation for the loss of use, measured by
rental or usable value, during the time that he was deprived of the use of
the destroyed or damaged improvement.

*Id.* at § 30:2.

7

As for one's personal property, a similar—yet distinct—methodology is found in

the case law:

> If the chattel cannot be repaired or restored, the owner is entitled to the fair market value of the property immediately before the occurrence or the loss. Fair market value is the price that the chattel would bring on the open market in a sale between a willing seller and willing buyer after a reasonable opportunity for negotiation . . . . [T]his recovery permits, at least in theory, the owner to enter the marketplace and purchase a comparable chattel.
>
> However, if the property is only damaged and can be repaired, the appropriate recovery is the difference in the fair market value of the property immediately before and after the damage.
>
> . . . .
>
> Arkansas case law, applying statutory authority, permits loss of use of damages in the instance of a damaged or destroyed motor vehicle. Loss of use damages are not available with other personal property.

*Id.* at § 5:2.

## III. DISCUSSION

## A. Undisputed Facts

Viewed in the light most favorable to Oak Creek, the following material facts are

undisputed:

- In 2002, Oak Creek purchased 12.5 acres of pastureland in Texarkana for $150,000.00 and began developing the Oak Creek Manufactured Home Park. The engineer-prepared and locally approved plat identified 62 separate mobile home sites.

- Oak Creek installed physical infrastructure, including water and sewer mains, underground electric lines, and three asphalt streets, along with driveways and utility service connections for each of the 62 home sites.

8

- Beginning in 2002, Oak Creek purchased 62 used manufactured homes (most of them from the Dallas, Texas area) and transported them to the park in Texarkana, Arkansas.

- On an average basis, Oak Creek paid approximately $8,000.00 for each mobile home.

- The mobile homes were attached to each of the 62 home sites by removing the tongues, wheels, and axles.

- According to Jimmy Hickey, Oak Creek incurred about $1,400,000.00 in development costs to build the mobile home park upon its land.

- At all relevant times, Oak Creek has owned both the land and the mobile homes.

- Oak Creek has rented the manufactured homes to its residential tenants from the time the park opened until the present.

- According to Jimmy Hickey, Oak Creek's long-range plan was to pay off its development debt and sell the mobile-home-park business as a going concern (including the 12.5 acres of land and all 62 mobile homes).

- On or about December 2015, the Defendants provided weatherization services and improvements to each of Oak Creek's 62 manufactured homes.

- CLEAResult designed the weatherization program. KMT provided the labor and materials. AEP-SWEPCO paid for the program.

- According to the Amended Complaint, Oak Creek contends that it "suffered physical damage to its mobile homes" due to the weatherization program.

- The Defendants have performed repairs to many of the mobile homes, but Oak Creek contends that the injuries persist, and that the damages are incapable of

repair. Oak Creek further contends that all 62 mobile homes have been—or are likely to be—destroyed.

- Oak Creek does *not* allege that the Defendants' weatherization program caused any physical injury to the land on which the mobile home park was built.
- Oak Creek has continued renting the mobile homes to its tenants.

## B. The Proper Measure of Property Damages

According to Oak Creek, CLEAResult was both vicariously and directly negligent for its role in the weatherization program. The Amended Complaint alleges multiple alternative theories on which Oak Creek seeks to recover damages, including "[past and] future loss of income, loss of profit, . . . and loss of value of the mobile home park as a going business concern." (Doc. 36, ¶¶ 4.11, 4.18).[1] CLEAResult disagrees with this particular theory of damages; it contends that the mobile homes should be construed as personal property and the proper measure of damages determined accordingly.

## 1. There is No *Per Se* Rule for Mobile Homes

In its motion, CLEAResult initially posits a *per se* rule in Arkansas whereby mobile homes are always considered personal property and the corresponding remedy limits damages to fair market value. According to CLEAResult, "well settled Arkansas law . . . clearly establishes that . . . mobile homes are considered personal property" (Doc. 80, p. 5). CLEAResult therefore contends that the jury should be instructed with AMI 2227 or 2228, depending on whether the mobile homes have salvage value. The Court disagrees. For one thing, the "well settled" law cited in support of its argument arises

---

[1] In its response, Oak Creek contends that its mobile-home-park business has suffered almost $4 Million in damages due to the negligent weatherization program. (Docs. 88-1, p. 4; 88-3, p. 13; and 90, p. 6).

from only two inapposite cases. The first is *Minerva Enterprises Inc. v. Howlett*, 308 Ark. 291 (1992), an Arkansas Supreme Court opinion. The second is *Lochridge Mobile Homes v. Mangus*, 1990 WL 42738 (Ark. Ct. App. April 11, 1990), an unpublished opinion with no precedential value.[2]

The *Minerva* case is instructive on the law of damages, but it does not provide sweeping support for CLEAResult's thesis. Howlett owned a mobile home that was situated on a lot that she rented in Minerva's mobile home park. 308 Ark. at 294–95. Howlett sued Minerva for negligence when the park's septic tank system backflowed and destroyed her mobile home and its contents with a flood of raw sewage. *Id.* Since Howlett owned the mobile home, but not the land on which it sat, the dispute was not about whether the mobile home was Howlett's personal property or an improvement to Minerva's land. In fact, as the Supreme Court noted, the parties agreed that the proper measure of damages before the jury was "the difference in fair market value immediately before and immediately after the damage occurred." *Id.* at 297–98. Instead, the issue on appeal was whether Howlett had "met [her] burden of proving value before and after the accident." *Id.* The Supreme Court found "no merit" to Minerva's argument that the proof at trial was insufficient. *Id.* at 299. The holding in *Minerva*, therefore, does not stand for the general proposition that mobile homes are always construed as personal property in Arkansas.

---

[2] Unpublished opinions of the Arkansas Court of Appeals "shall not be cited, quoted, or referred to by any court or in any argument, brief, or other materials presented to any court (except in continuing or related litigation upon an issue such as res judicata, collateral estoppel, or law of the case)." Ark. Sup. Ct. R. 5-2(c). Consequently, *Lochridge* cannot serve as the foundation for a *per se* rule of damages. Moreover, the mobile home in that case was damaged either in transit or in the course of attaching it to a home site.

Consequently, on this point, the Court agrees with Oak Creek: Mobile homes cannot be succinctly labeled as either real or personal property. Instead, their classification requires consideration of various facts and circumstances that differ from case to case. Fortunately, as discussed in the next section, the pertinent facts necessary to analyze those considerations are not disputed here.

### 2. The Mobile Homes Are Not Personal Property

In *Pledger v. Halvorson*, the Arkansas Supreme Court considered whether mobile homes were subject to a gross receipts tax as personal property or were exempt from the tax as fixtures to real property. 324 Ark. 302, 303–04 (1996). The Court explained that there are "basic rules for determining whether an article remains personal property or becomes a fixture" and then set forth the following factors to consider:

(1) whether the items are annexed to the realty, (2) whether the items are appropriate and adapted to the use or purpose of that part of the realty to which the items are connected, and (3) whether the party making the annexation intended to make it permanent.

*Id.* at 305.

The *Pledger* Court cited two other Arkansas Supreme Court cases from 1979, *McIlroy Bank & Trust Fayetteville v. Federal Land Bank of St. Louis*, 266 Ark. 481; and *Corning Bank v. Bank of Rector*, 265 Ark. 68, as the dual sources for its three-pronged test. Both cases are instructive here because questions of fact controlled whether the property at issue was deemed personal property or a fixture (or improvement) to real property.

The *McIlroy* case concerned whether milking equipment contained in a barn that was subject to a mortgage ran with the land as a fixture or was separate personal property not subject to the bank's foreclosure action. 266 Ark. at 482–83. The Court affirmed the

12

trial court's finding that the milking equipment was a fixture subject to the mortgage, even though the evidence showed that the equipment was capable of detachment from the barn with only "a hammer, wrench, or screwdriver." *Id.* at 483.

Similarly, the *Corning* case involved whether grain bins were either fixtures or personal property. 265 Ark. at 71–72. The *Corning* Court pointed out that the grain bins were more like small buildings "consist[ing] of a floor, roof and sides," and reasoned that "[u]nless the facts are undisputed and reasonable minds could only reach one conclusion, the question whether particular property constitutes a fixture is sometimes one of fact only, but usually is a mixed question of law and fact." *Id.* at 72–73. In the end, the Supreme Court upheld the chancellor's finding in *Corning* that the grain bins "were 'permanent property' and a part of the real estate." *Id.* at 72.

After discussing the *McIlroy* and *Corning* cases, the *Pledger* Court returned to its three-part test for personal property and noted that that the phrase "annexed to the realty" in the first part of the test meant "affixed to the real estate." 324 Ark. at 306. The Court then noted that all parties had agreed that the mobile homes at issue had been "annexed" to the land because they had been "placed on permanent foundations or pillars" with "the wheels and tow tongues . . . removed." *Id.* The third factor was the most challenging for the *Pledger* Court: *Why* had the mobile home owners affixed their mobile homes to the real property in the first place? The Court observed:

> If the item being affixed is owned *by the same person who owns the land*, then the act of attaching the item to the realty is generally considered a sufficient basis for an objective observer to regard the item as having become part of the real estate. If, on the other hand, the owner of the item affixes it *as tenant to the property owned by the landlord*, the opposite presumption generally arises. The likely intent of the tenant negates the fixture characterization because the tenant has probably installed the item

13

> for his own enjoyment, convenience, or use and will generally be regarded as intending to preserve rights in the item as personalty.

*Id.* at 306 (emphasis added) (quoting 5 RICHARD R. POWELL, THE LAW OF REAL PROPERTY, ¶ 652[1] (1987)).

Largely because the mobile home owners did not also own the real property to which the their homes were affixed, the *Pledger* Court found that the attachment of the mobile homes to the land was not "intended to be permanent," even though "none of the [homeowners] had manifested any intent to move their homes . . . ." *Id.* at 307. The Court therefore reversed the chancellor's finding that the homes were fixtures to real property and found instead that they were personal property. *Id.* at 303–04.

Applying the *Pledger* factors to the undisputed facts before the Court on summary judgment, the Court finds that Oak Creek's mobile homes have become a part of the real property. The mobile homes have been annexed to the realty: They are affixed to the land, with their tongues, wheels, and axles having been removed. Next, the mobile homes have been adapted to the use or purpose of the realty to which they are connected: The homes are physically connected to the underground infrastructure, and each home has access to a driveway and asphalt streets constructed within the mobile home park. Finally, it is beyond dispute here that Oak Creek intended to make the annexation of the mobile homes permanent: For unlike the *Pledger* case—where different parties owned the mobile homes and the real property—Oak Creek is the owner of both the homes and the realty.

Accordingly, CLEAResult's Motion for Summary Judgment must be **DENIED** in part, because the mobile homes are not personal property. However, more broadly, CLEAResult's Motion seeks a legal ruling now—in advance of trial—as to the proper

measure of Oak Creek's damages—even if the Court construes the mobile homes as improvements to the land. (Docs. 79, ¶ 6; 91, ¶ 4). Given the undisputed facts, the Court agrees that the time is ripe to determine the proper measure of damages as a matter of law.

### 3. The Mobile Homes Are Improvements to Real Property

In its Response, Oak Creek now unequivocally contends that its manufactured homes "are improvements to real property." (Doc. 90, pp. 2–6). The Court agrees. Since the mobile homes are not personal property, the undisputed facts support no other conclusion.

Among its various alternative remedies, Oak Creek alleges that the weatherization program caused it to suffer damages, including the "loss of value of the mobile home park as a going concern." (Doc. 36, ¶ 4.11). To compensate it for this loss, and assuming that all 62 mobile homes are beyond repair, Oak Creek seeks to recover general damages in the form of "replacement costs of all mobile homes in order to restore the fair market value of it mobile home park as an ongoing business concern to the value before the injuries to the same occurred." *Id.* at ¶ 5.2. Oak Creek also prays for damages in form of lost rental income and lost profits. *Id.* at ¶ 5.7.

To be perfectly clear, though, when Oak Creek asserts a remedy for the "replacement costs of all mobile homes," it is not asking for the blue-book value of comparable 20-year-old used mobile homes. Rather, Oak Creek seeks the fair market value of its mobile-home-park *business* before the weatherization program, less its current value. For example, when Plaintiff's designated expert, Jeffery Rothbart, estimates that Oak Creek's "property" was worth about $3,650,000.00 before the

weatherization program, he is not opining about *property* appraisals. Instead, he has estimated the value of the *business* by applying a 7% capitalization rate to Oak Creek's average net operating income of $255,331.00. (Docs. 88-3, p 12; 88-1, p. 4). In this same vein, when Mr. Rothbart offers the *ipse dixit* opinion that Oak Creek's "property" is not presently worth anything, he means that Oak Creek's mobile-home-rental *business* has been devalued to zero dollars. (Doc. 88-3, pp. 5–6). This is where the Court parts company with Oak Creek.

As explained in the excerpts quoted above from Professor Brill's treatise, the proper measure of damages to real property depends on whether the negligence resulted in injury to the land itself, as contrasted with an injury to the improvements upon the land. Here, Oak Creek conflates an injury to its improvements with a damages remedy for permanent and irreparable physical injury to the land.[3] The disconnect being that Oak Creek has not suffered any physical injury to its land whatsoever. The facts on this point are unequivocal and undisputed. In its Amended Complaint, Oak Creek alleges that CLEAResult's negligence caused it "physical damage to its mobile homes." (Doc. 36, ¶ 4.18). There is no allegation in the operative complaint, much less any evidence in the summary judgment record, that the Defendants' weatherization program caused physical injury to Oak Creek's land.

---

[3] It is not the Court's intent to suggest that devaluation of a business is the proper measure of damage for permanent injury to a business's land. The Court simply reserves the possibility that such methodology might be one way for a property appraiser to express the "difference in fair market value immediately before and immediately after the occurrence," which *is* the appropriate measure of damages for permanent physical injury to land. Brill and Brill, 1 *Arkansas Practice Series: Law of Damages* § 30:1 (6th ed.).

16

Improvements to real property—analogous to the mobile homes here—are never valued in relation to the underlying realty when they suffer injury. The seminal case on the issue is *Bush v. Taylor,* which was decided by the Arkansas Supreme Court in 1917 and established the framework that courts still use today in valuing fixtures to real property. 197 S.W. at 1174. According to the *Bush* Court,

> if the value of the property destroyed depends upon its connection with the soil, the measure of the damages is the difference in the value of the land before and after the [injury]. But, if the property destroyed could be replaced in substantially the condition in which it existed before the [injury], then the measure of the damages is the cost of so replacing it.

*Id.* Using that reasoning, the *Bush* Court determined that the trial court had erred in instructing the jury as to the proper measure of damages for "a sawmill with the building which housed it" that had been destroyed by fire. *Id.* at 1175. Since only the sawmill had sustained injury, the value of the entire parcel of land to which the sawmill was affixed was irrelevant to the calculation of damages. The Court explained that the value of the parcel of land became relevant when there was injury to grasses and mature trees that were literally connected to the soil and "could not be replaced in a short time and only at considerable expense . . . ." *Id.* at 1174. Those items were properly valued in comparison to the land itself, due to their close connection. By contrast, a house or other building situated on a plot of land was subject to a different measure of damages entirely. The Court reasoned that in the case of a destroyed building, "the true inquiry was as to the cash market value of the building," rather than the value of the land before and after injury. *Id.*

The rule from *Bush v. Taylor* was later extended in *Cy Carney Appliance Co. v. True,* 226 Ark. 961 (1956). In *Cy Carney*, a fire on a farm destroyed a number of shade

trees and the plaintiffs' farmhouse. The plaintiffs alleged that the fire was caused by an employee of the Cy Carney Appliance Company who negligently filled a butane gas tank near the farmhouse and started the blaze. *Id.* at 962. On appeal to the Arkansas Supreme Court, the company objected to the way the trial court assessed the injury to the shade trees as compared to the injury to the farmhouse. The injury to the trees involved comparing the fair market value of the entire parcel of real property before the fire to the fair market value of the real property after the fire. *Id.* at 964. But the injury to the house was found to be equal to the cost required to restore it to its original condition before the fire. *Id.* at 965. Though the company argued that the true measure of damages to the house should have been "the market value of the farm [with the house on it] just before the fire and the market value just after the fire, considering loss of house only," *id.*, the Court rejected this analysis. Pointing to the reasoning in *Bush v. Taylor*, the *Cy Carney* Court observed:

> [I]f the value of the property destroyed depends upon its connection with the soil (as in the case of shade trees for instance) the measure of damages is the difference in the market value of the land before and after destruction, but, if the property destroyed can be replaced in substantially the same condition it was immediately before destruction (as in the case of a house) then the measure of damages is the cost of replacement.

*Id.* at 966.

The applicability of this remedy assumes, of course, that Oak Creek's mobile homes could "be replaced in substantially the condition in which [they] existed before the [injury]." *Id.* The Court finds that there is no genuinely disputable fact about the replaceability of the improvements here. After all, it is undisputed that the homes in question were purchased by Oak Creek on the used-mobile-home market back in 2002. And there is no good reason to believe that such markets do not continue to exist today.

18

The Court therefore concludes that it would be incorrect to measure damages based on the before-and-after difference in fair market value of Oak Creek's business as a going concern. And to that extent, CLEAResult is correct, and its Motion for Partial Summary Judgment is therefore deemed **GRANTED** in part.

#### 4. The Proper Measure of Oak Creek's Damages

Since the mobile homes here are construed as improvements to real property, the only remaining issue is whether the alleged negligence destroyed the homes, or merely damaged them. On this question, the facts are in dispute. The parties seem to agree that 24 of the 62 mobile homes have sustained injuries to some unarticulated extent. But while CLEAResult says those damages have been repaired and that all homes remain rent-worthy, Oak Creek contends that all 62 mobile homes have been—or will eventually become—destroyed and unusable.

If the proof at trial shows that the mobile homes have been destroyed beyond repair—as Oak Creek contends—then the proper measure of general damages is the reasonable cost to replace the mobile homes, as explained above. See Bush v. Taylor, 197 S.W. 1172, 1174 (Ark. 1917). But here, too, "cost to replace" does not mean the cost to replace 15-year-old mobile homes with brand new ones—as Oak Creek seems to believe. The age, condition, and depreciated state of the mobile homes must be taken into consideration. See Barnes v. Young, 238 Ark. 484, 488 (1964) (finding that the proper measure of damages for a completely destroyed, fifty-year-old fence situated on real property was not "the replacement cost of a new fence," but "the cost of replacement of the existing fence in substantially the same condition that existed at the time appellants destroyed it"); Powell v. TIP Petroleum, Inc., 510 F.3d 818, 824 (8th Cir. 2007) (holding

19

that when chattel affixed to realty suffers damage, it is inequitable to consider replacing a damaged, old item with a brand new one, since "the measure of compensatory damages would be best represented as the cost of installing the new [chattel] reduced by the difference in value between the new [chattel] and the old [chattel], though the market value of the old [chattel] at the time of their removal would presumably also be an acceptable measure of damages").

Oak Creek would also be entitled to recover economic damages for any consequential lost rents. *Arkansas-Missouri Power Co. v. Deal*, 263 Ark. 645, 648 (1978). In pragmatic terms, if the proof shows that Oak Creek's mobile homes were destroyed, then the proper measure of damages is based on the cost to replace them with other used mobile homes of reasonably similar age and condition, and the jury should therefore be instructed with AMI 2225.

If, however, the proof shows that the mobile homes (or any number of them) were not destroyed, but merely sustained damages which are reasonably capable of repair, then damages are properly measured by the reasonable cost of repair. Stated another way, Oak Creek would be entitled to "the cost of restoration to the condition prior to the injury," *Benton Gravel Co. v. Wright*, 175 S.W. 2d 208, 209 (Ark. 1943). Subject to the proof at trial, consequential damages are also proper for the "decreased rental value from the time of injury to the time of award for restoration." *Id.* In this event, the jury should be instructed with AMI 2224.

## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that CLEAResult Consulting, Inc.'s Motion for Partial Summary Judgment (Doc. 79) is **GRANTED IN PART AND DENIED**

20

**IN PART**. Oak Creek's third-party beneficiary/breach of contract claim against CLEAResult in Count 4 of the Amended Complaint (Doc. 36)—with respect to the contract between CLEAResult and Separate Defendant KMT Group, Inc.—is **DISMISSED WITH PREJUDICE**. The Motion is **DENIED** as to CLEAResult's request that the Court construe the mobile homes as personal property; but the Motion is **GRANTED** in other respects, to the extent explained above.

**IT IS SO ORDERED** on this \_\_\_\_\_ day of January, 2020.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE