IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

OAK CREEK INVESTMENT PROPERTIES, INC.                                    **PLAINTIFF**

**V.**                                    **CASE NO. 4:18-CV-4009**

AMERICAN ELECTRICAL POWER SERVICE
CORPORATION; KMT GROUP, INC.; and
CLEAResult CONSULTING, INC.                                    **DEFENDANTS**

**AND**

KMT GROUP, INC.                                    **THIRD-PARTY PLAINTIFF**

**V.**

JIMMY HICKEY and RICHARD SMITH                    **THIRD-PARTY DEFENDANTS**

<u>OMNIBUS OPINION AND ORDER ON SEPARATE DEFENDANT
KMT GROUP, INC.'S AFFIRMATIVE CLAIMS</u>

Now before the Court are eight ripe summary judgment motions (Docs. 92, 135,

138, 145, 146, 152, 155, and 162). The motions request that the Court dismiss the

affirmative claims of Separate Defendant KMT Group, Inc. ("KMT"), which appear in

KMT's Amended Answer, Third-Party Complaint, Crossclaims, and Counterclaims (Doc.

35).[1] The claims made by KMT are as follows:

| | |
|---|---|
| <u>Count 1</u>: | Defamation (against all parties); |
| <u>Count 2</u>: | Interference with Contract/Business Expectancy (against all parties); |
| <u>Count 3</u>: | Unjust Enrichment (against all parties); |
| <u>Count 4</u>: | Fraud (against all parties); |
| <u>Count 5</u>: | Breach of Fiduciary Duty (against AEP-SWEPCO and CLEAResult); |
| <u>Count 6</u>: | Violations of the Arkansas Deceptive Trade Practices Act ("ADTPA") (against all parties); |

---

[1] The claims that KMT asserts against Plaintiff Oak Creek Investment Properties, Inc.
("Oak Creek") are styled as counterclaims; the claims against Separate Defendants
American Electric Power Service Corporation ("AEP-SWEPCO") and CLEAResult
Consulting, Inc. ("CLEAResult") are styled as crossclaims; and the claims against Third-
Party Defendants Jimmy Hickey and Richard Smith are styled as third-party claims.

1

| Count 7: | Violations of the Arkansas Unfair Practices Act ("AUPA") (against AEP-SWEPCO and CLEAResult); |
| Count 8: | Breach of Contract (against AEP-SWEPCO and CLEAResult); and |
| Count 9: | Conspiracy (against all parties). |

Separate Defendant CLEAResult moves for summary judgment on KMT's Count

1 (Doc. 146), Count 2 (Doc. 92), Count 5 (Doc. 155), and Count 8 (Doc. 152).

Separate Defendant AEP-SWEPCO moves for summary judgment on KMT's

Count 8 (Doc. 135) and Counts 1, 3, 4, 6, and 9 (Doc. 138). CLEAResult moves to join

AEP-SWEPCO's summary judgment motion concerning Counts 1, 3, 4, 6, and 9. *See*

Doc. 145.

Finally, Plaintiff Oak Creek and Third-Party Defendants Hickey and Smith jointly

move for summary judgment on KMT's Counts 1, 2, 3, 4, 6, and 9 (Doc. 162).

KMT responded to all motions, and the moving parties filed their respective replies.

Below, the Court will begin its analysis by briefly reciting the background facts of the case

and then consider whether each of KMT's nine Counts listed above should be dismissed

on summary judgment as to each moving party.

## I. BACKGROUND

KMT is a Texas for-profit corporation specializing in performing construction work

on both residential and commercial properties. In 2015, KMT entered into a Contractor

Network Agreement ("Agreement") with CLEAResult and AEP-SWEPCO.[2] *See* Doc. 35-

1. CLEAResult had developed a weatherization program, called Home Performance with

Energy Star ("HPwES"). This program was designed to incorporate structural changes to

---

[2] KMT argues in response to summary judgment that CLEAResult was not a party to this Agreement and was instead merely an agent for AEP-SWEPCO. The Court will consider this argument in Section III.B.1, *infra*.

homes and businesses to make them more insulated and weather resistant, thereby creating cost savings through energy efficiency. Under the Agreement, KMT served as "Contractor," performing the necessary structural modifications on AEP-SWEPCO's customers' homes in keeping with the HPwES program's requirements. CLEAResult served as program "Administrator," inspecting and approving KMT's work. Once CLEAResult approved the work, KMT would submit its bills to the Agreement's "Sponsor," AEP-SWEPCO, for payment. Customers paid nothing for the improvements made to their homes, as the Arkansas Public Service Commission had authorized AEP-SWEPCO to pay the contractors directly. Each contractor, including KMT, was obligated to perform the work per the program's specifications and then submit an annual request for qualification ("RFQ") to CLEAResult in order to be approved to receive further work the following year.

In 2014, representatives from KMT approached AEP-SWEPCO's customer, Oak Creek, about implementing the HPwES program at the company's mobile home park in Texarkana, Arkansas. Oak Creek's directors ultimately approved the project, and in December of 2015, KMT modified the park's 62 mobile homes in an effort to make them weather-tight.

In August of 2016, Jimmy Hickey, one of the owners of Oak Creek, complained to KMT that the floors of some of the mobile home units were buckling due to the modifications KMT had made. KMT reported the complaint to CLEAResult, which, in turn, sent representatives to inspect the units. It is KMT's position that any floor damage sustained by the units was not KMT's fault. Instead, KMT contends that the flooring was already damaged before the weatherization work took place, or else the damage was

3

caused by CLEAResult's design and choice of materials and not KMT's workmanship. KMT maintains that both AEP-SWEPCO's and CLEAResult's representatives agreed that "the problems appeared to the be the result of conditions such as excess moisture due to Oak Creek's lack of proper vapor barriers underneath the trailers and/or improperly installed or damaged underbellies." (Doc. 35, p. 8).

On October 24, 2016, Oak Creek submitted an invoice for $18,616.72 to AEP-SWEPCO for costs associated with repairs to the damaged mobile homes. KMT examined the invoice and objected that certain line items were either overstated or referenced work that was not actually performed. In other words, KMT complained to AEP-SWEPCO and CLEAResult that Oak Creek had inflated and fabricated at least some costs for which it now demanded reimbursement. Despite KMT's objections, AEP-SWEPCO withheld $9,308.36 from KMT's paycheck, an amount equal to half of Oak Creek's total invoice. *See* Doc. 114-13. In addition, KMT claims that it was "forced by AEP and CLEAResult to hire a third-party, independent contractor, Alton Thornhill, to make tens of thousands of dollars of repairs to mobile homes at Oak Creek on the promise of continued work within the GridSMART[3] program, or the threat of exclusion by AEP and CLEAResult from the same if they did not." *Id.* at p. 13. According to KMT, "[a] majority of these repairs [at Oak Creek] were for issues that both AEP and CLEAResult had previously acknowledged were not the result of KMT's work." *Id.*

KMT also contends that that it was "forced . . . to sign a false Corrective Action Form accepting all responsibility for these problems, or be excluded from the GridSMART

---

[3] KMT's Amended Answer (Doc. 35) refers to the weatherization program as GridSMART, but all later filings refer to it as "Home Performance with Energy Star," or HPwES.

program." *Id.* at p. 13. It appears that KMT *did* sign the Corrective Action Form (Doc. 36-1), even though KMT claims it "routinely complained that many of the repairs it was forced to make were not related in any way to the GridSMART program." *Id.* According to KMT, after it signed the Corrective Action Form and admitted liability for the damage at Oak Creek, it "was blacklisted in the industry and lost all of its energy efficiency business throughout a three-state region . . . ." *Id.* at p. 17. KMT ended up losing its contract with CLEAResult and AEP-SWEPCO for the 2018 program year. *See* Doc. 92-6.

## II. LEGAL STANDARD

A party moving for summary judgment must establish both the absence of a genuine dispute of material fact and its entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999). When no material facts are in dispute, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case." *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978). In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. DISCUSSION

### A. Count 1: Defamation (CLEAResult's Doc. 146, AEP-SWEPCO's Doc. 138, and Oak Creek/Hickey/Smith's Doc. 162)

KMT charges all other parties to this lawsuit with the tort of defamation. The essential elements of a defamation claim are: (1) the defamatory nature of a statement of

5

fact, (2) that statement's identification of or reference to the plaintiff, (3) publication of the statement by the defendant, (4) the defendant's fault in the publication, (5) the statement's falsity, and (6) the plaintiff's damages. *Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941, 955–56 (2002).

CLEAResult believes there is no evidence to show that it published a defamatory remark about KMT to any third party. Also, CLEAResult argues that KMT cannot prove that it suffered damages as a result of any such defamatory statement. *See* Doc. 147, pp. 4–7. AEP-SWEPCO contends that KMT never identified a statement made by an AEP-SWEPCO employee that was, in fact, defamatory.

Oak Creek, Hickey, and Smith admit that they complained to AEP-SWEPCO and CLEAResult about damage to the mobile homes; however, they do not believe that such complaints—uttered within the vendor-customer relationship regarding the quality of services—qualify as having been "published" to a third party.

KMT responds to the parties' arguments by making two observations. First, it points out that it did quality work at Oak Creek but was made to shoulder all the blame for errors that were not its fault. Second, it argues that because it did quality work at Oak Creek, any statements to the contrary made by any party to the lawsuit are false and, therefore, defamatory in nature. The specific statements claimed as defamatory are as follows: (1) an email dated November 28, 2017, involving two managers from AEP-SWEPCO and one from CLEAResult, negatively reviewing KMT's performance (Doc. 114-25); (2) a comment made by a CLEAResult manager to Oak Creek co-owner Jimmy Hickey about KMT's performance (Doc. 178-4, p. 5; 187-10, p. 3); (3) an email dated October 18, 2016, from Mr. Hickey to a CLEAResult manager (and cc'ing Oak Creek co-

6

owner Richard Smith and two employees of AEP-SWEPCO), discussing problems with the flooring in the mobile homes (Doc. 188, p. 3); (4) a communication between Mr. Hickey and a KMT manager, in which Mr. Hickey complained that KMT caused a mold problem at Oak Creek and would not be welcome back to the property (Affidavit of Jared Smith of KMT, Doc. 187-6, p. 4)[4]; (5) an email dated October 4, 2017, from a CLEAResult manager to an AEP-SWEPCO manager, describing remedial work that KMT was then performing at Oak Creek (Doc. 187-8); (6) and the $18,616.72 invoice submitted by Oak Creek to AEP-SWEPCO (Doc. 187-9, pp. 13–15) that contains allegedly false charges for repairs made to the mobile homes. The six communications listed above have been grouped and considered by the Court in the following discussion.

### 1. Emails between AEP-SWEPCO and CLEAResult Managers

The first and fifth allegedly defamatory statements noted above are emails between managers employed by AEP-SWEPCO and a manager employed by AEP-SWEPCO's agent, CLEAResult. The first email is dated November 28, 2017 (Doc. 114-25), and is between Sherry McCormack, a manager of AEP-SWEPCO in Arkansas, and Debra Miller, a manager of AEP-SWEPCO in Texas. In the email, Ms. Miller describes how she received applications from KMT and another contractor to perform energy-efficiency work for AEP-SWEPCO in Texas. Since both of these contractors had been working for AEP-SWEPCO in Arkansas, Ms. Miller asked Ms. McCormack's opinion on their performance and quality of work. Ms. McCormack referred Ms. Miller's request to CLEAResult manager Jacob Nielson, since, presumably, he had direct experience

---

[4] KMT owner Brad Warren also testified that Mr. Hickey "told everybody that we had [caused] black mold on his property." (Doc. 187-7, p. 5). The Court will not consider this statement as possibly defamatory because, on its face, it is too speculative to be credited.

7

working with the contractors. Mr. Nielson reviewed KMT's and the other contractor's performances and sent the review to Neal Frizzell of CLEAResult for comment. Then Mr. Nielson sent the review to Ms. McCormack, who forwarded it to Ms. Miller.[5]

Mr. Nielson's written review includes a chart showing how CLEAResult scored both KMT and the other contractor. (Doc. 114-25). On the whole, Mr. Nielson's review of KMT's work is negative. He describes KMT as having "stumbled a lot along the way with poor partnerships, employee selection and overall quality of work and CS [Customer Service]." *Id.* He also writes that KMT performed "mediocre work" driven by a "Quantity/Quality and cash flow model" and a "high turnover rate." *Id.* On the positive side, he observes that the previous year, KMT "made some strides in better overall training, internal policies, workflow and their quality has come up some based on that additional training and process development." *Id.* However, he concludes the performance review by describing KMT as "slow to take and make corrections at times" and given to "arguing the fact or justifying the action" instead of admitting its errors. *Id.*

First, the Court observes that KMT fails to distinguish which statements in the email string are purportedly false and which are true. Instead, it simply asserts that the entire email string is false because the contents of it either state or imply that KMT is not a good contractor. The Court presumes, however, that KMT believes the positive review of its performance is true, such as Mr. Nielson's observation that KMT improved its training and policies and, in doing so, caused their "work flow and their quality" to "come up some." *Id.*

---

[5] Ms. Miller later testified that she decided not to hire KMT to work on AEP-SWEPCO's projects in Texas because of the negative feedback she received about KMT from Ms. McCormack and Mr. Nielson. (Doc. 187-14).

8

Second, the Court finds that the email string cannot support a claim for defamation because it was passed among two managers employed by a single corporation (AEP-SWEPCO) and a manager of the corporation's designated agent (CLEAResult). "In a defamation case a libelous or slanderous statement must be published or communicated to a third person to be actionable." *Farris v. Tvedten*, 274 Ark. 185, 186 (1981) (citing W. Prosser, THE LAW OF TORTS § 113 (4th ed. 1971)). "A corporation cannot publish a defamatory statement to itself" or to anyone inside the "corporate sphere." *Roeben v. BG Excelsior Ltd. P'ship*, 344 S.W.3d 93, 96 (Ark. Ct. App. 2009). Moreover, "[c]ommunications made by a principal to an agent, or by an agent to a principal, relative to the subject-matter of the business of the agency or employment, and containing information or giving direction relative thereto, fall within the class of privileged communications . . . ." *Bohlinger v. Germania Life Ins. Co.*, 140 S.W. 257, 259 (Ark. 1911). Here, KMT has failed to argue that Ms. Miller's request for a performance review of KMT or Mr. Nielson's response to that request fell outside the scope of the principal-agent relationship between AEP-SWEPCO and CLEAResult. Quite the opposite is true: The agent's opinions were *solicited* by the principal. Further, there is no dispute that a public utility maintains an interest in using only qualified contractors, and CLEAResult, as AEP-SWEPCO's agent tasked with choosing contractors, shares a common interest with the utility. These communications, therefore, "fall within the class of privileged communications." *Id.*

As for the second email dated October 4, 2017 (Doc. 187-8), this was sent by Neal Frizzell of CLEAResult to Kent Tomlinson of AEP-SWEPCO, cc'ing Ms. McCormack of AEP-SWEPCO and Mr. Nielson of CLEAResult. The email explains Oak Creek's claims

that its mobile homes suffered damage due to the weatherization protocols implemented by KMT, including damage to the mobile home floors and the development of mold in some of the units. The email also describes the repairs that KMT intended to perform. If KMT maintains that the contents of this email are entirely false—which is not obvious from KMT's briefing—the Court finds, nevertheless, that the email is between employees of a principal and an agent, discussing matters fully within the scope of that relationship. This email, like the one from November 28, is not defamatory.

### 2. Email and Invoice Sent by Mr. Hickey to CLEAResult/AEP-SWEPCO

The third and sixth examples of defamation cited by KMT include an email dated October 18, 2016 (Doc. 188, p. 3), from Mr. Hickey of Oak Creek to Mr. Nielson of CLEAResult (and cc'ing Richard Smith of Oak Creek and Ms. McCormack and Phillip A. Watkins of AEP-SWEPCO), and an invoice sent by Oak Creek to AEP-SWEPCO (Doc. 187-9, pp. 13–15). The email states that Oak Creek "never" had an issue with floors buckling until the weatherization program began—which KMT claims is a false statement; and the invoice lists charges for repairs that Oak Creek claims it was forced to make due to KMT's faulty installation.

Beginning with the email, it is not at all clear to the Court that the words used therein are "defamatory in nature," which is a required element of the tort. *See Faulkner*, 347 Ark. at 955–56. Though Mr. Hickey makes the statement in the email that the mobile home floors "never" buckled in the past, he does not name KMT in the email, nor does he accuse KMT of any wrongdoing. What he does claim is that the floor damage was not a preexisting condition. Perhaps one could infer that when Mr. Hickey stated that the floors had not been damaged before, what he really meant was that AEP-SWEPCO's contractor

10

caused all the damage, and the contractor happened to be KMT. But that sentiment is certainly not explicit in the email. Accordingly, the Court finds there is no genuine, material dispute of fact that the email "tends or is reasonably calculated to cause harm to another's reputation," namely, KMT's. *See Patrick v. Tyson Foods, Inc.*, 489 S.W. 3d 683, 695 (Ark. Ct. App. 2016).

The same arguments above apply to Oak Creek's invoice. The invoice was not addressed to KMT; it was addressed to AEP-SWEPCO. The invoice does not name KMT, impugn KMT's reputation, or demand that KMT pay for damages. The tort of defamation cannot be established by pointing to line items on a bill and claiming they are false. To be defamatory, the statement at issue must identify the complaining party, be published to a third party, be false, *and* implicate the complaining party's reputation. Therefore, the Court rejects KMT's argument that the invoice is defamatory because it "falsely assert[s] damages caused as a result of KMT's negligence." (Doc. 188, p. 6).

### 3. Comment Made by CLEAResult Manager to Oak Creek Co-owner

The second example of defamation identified by KMT is a comment made by Mr. Nielson of CLEAResult to Mr. Hickey of Oak Creek about KMT's performance. (Doc. 178-4, p. 5; 187-10, p. 3). The statements appear in Mr. Hickey's deposition testimony in the following two places:

> But [Nielson] said that they were continuing to keep KMT . . . they were keeping them on as leverage to keep them working for the mobile home park.

(Doc. 178-4, p. 5).

> Jacob [Nielson] told me that the only reason that KMT had been . . . . that the only reason that, you know, they were still working for them was so that they could provide leverage on them to keep them working at the park.

11

(Doc. 187-10, p. 3).

Again, it is not clear to the Court that the above statements are defamatory with respect to KMT's status or reputation. It appears that Mr. Nielson told Mr. Hickey that CLEAResult would be exerting influence or "leverage" on KMT to keep the contractor working on repairs at Oak Creek. Furthermore, all evidence of record indicates that Mr. Nielson's statement was true. KMT admitted in its briefing on summary judgment that it did not want to perform repairs at Oak Creek and only agreed to do so because it hoped to receive future work from CLEAResult—the "leverage" Mr. Nielson mentioned to Mr. Hickey. See KMT's Brief in Opposition to Motion for Partial Summary Judgment, Doc. 115, pp. 4–5 ("KMT also objected to being forced to perform the remedial work referenced above, and advised that it was not qualified to perform the 'underbelly work' now required of it . . . . Having little leverage and fearing the loss of its business, KMT performed the work referenced above." (emphasis added)); Affidavit of Jared Smith, Doc. 178-11, pp. 3–4 ("Although KMT did not believe it did anything wrong in its implementation of the HPwES program at Oak Creek, KMT nonetheless performed the work required by CLEAResult, AEP, Oak Creek, Jimmy Hickey, and Richard Smith because CLEAResult and AEP told us that in order to continue working in the energy efficiency programs we would have to perform this work.").

In sum, the Court finds that the statements made by Mr. Nielson to Mr. Hickey about KMT's motivations for doing repair work at Oak Creek are not only not defamatory in nature, but also true. The statements cannot support a claim of defamation.

#### 4. Communication between Mr. Hickey and a KMT Manager

The fourth example of defamation listed by KMT appears in the affidavit of Jared Smith, KMT's general manager. (Doc. 187-6, p. 4). Mr. Smith asserts that Mr. Hickey complained to him that KMT had caused a mold problem at Oak Creek and would not be welcomed back to the property (Affidavit of Jared Smith, Doc. 187-6, p. 4). This comment does not qualify as defamatory because it was not published to a third party; it was published by Mr. Hickey to an employee of KMT.

Because KMT has failed to meet its burden on summary judgment with respect to Count 1, the claim is **DISMISSED WITH PREJUDICE as to all parties**.

### B. Count 2: Intentional Interference with Contract/Business Expectancy (CLEAResult's Doc. 92 and Oak Creek/Hickey/Smith's Doc. 162)

The essential elements of the tort of intentional interference with a contractual relationship or business expectancy are: (1) a valid contractual relationship or business expectancy, (2) the interfering party's knowledge of the relationship, (3) intentional interference inducing a breach of the relationship, and (4) plaintiff's damages as a result of the interference. *Vowell v. Fairfield Bay Cmty. Club, Inc.*, 346 Ark. 270, 276 (2001).

#### 1. Interference by CLEAResult

CLEAResult argues that KMT has failed to establish any of the elements of the tort of interference with a contractual relationship or business expectancy. CLEAResult notes that it was a party to the Agreement involving KMT and AEP-SWEPCO (Doc. 35-1). As such, CLEAResult cannot be charged with interfering with *its own* contract with KMT. Under Arkansas law, "a party to a contract and its employees and agents, acting within the scope of their authority, cannot be held liable for interfering with the party's own contract." *Faulkner*, 347 Ark. at 959.

CLEAResult further argues that the alleged "interference" KMT complains of was the decision to stop working with KMT, an act CLEAResult believes permissible under the Agreement's terms—and, therefore, not an act of tortious interference. CLEAResult points out that KMT, like all other HPwES contractors, was required to reapply for contractor status each year by filling out a form called "Request for Qualifications" ("RFQ") and by submitting documentation. *See, e.g.*, Doc. 92-2. CLEAResult elected not to renew KMT's contract for 2018. The RFQ explains that "participation in this Program is a privilege, and the Sponsor may suspend or terminate the Contractor's participation in the Program at any time and for any reason." *Id.* at p. 8. Further, the parties' Agreement states that CLEAResult "reserves the right to terminate or to modify this Agreement at any time for Contractor's noncompliance with the Program Manual, any law, any clause of this agreement." (Doc. 35-1, p. 5).

CLEAResult also argues that KMT has no proof beyond mere speculation that CLEAResult intentionally interfered with some other contract or business expectancy involving a third party. CLEAResult further contends that KMT has no competent proof that it was actually involved in a contractual relationship with any third party or had a valid business expectancy with any third party.

In its response, KMT asks the Court to defer ruling on this motion because CLEAResult has withheld from discovery certain documents that KMT claims it needs to respond fully. The documents identify the names of other contractors that worked on the HPwES project at the same time as KMT and immediately after KMT was fired. KMT's next argument is that there was no contract between it and CLEAResult. Instead, CLEAResult was only an agent of AEP-SWEPCO's and not a full party to the Agreement.

14

As a result, KMT believes it was legally possible for CLEAResult to have tortiously interfered in the Agreement to KMT's detriment.[6] Further, KMT offers proof that it was involved in contracts with third parties and had valid business expectancies with third parties performing similar energy-efficiency projects in Texas, Arkansas, and Louisiana. KMT believes CLEAResult intentionally interfered with those contracts and business expectancies by spreading lies about KMT's work, which resulted in KMT being "blacklisted" in the industry.

Beginning with KMT's argument that the summary judgment motion cannot be decided due to discovery violations, the record reflects that CLEAResult filed its motion for summary judgment as to Count 2 on September 13, 2019, three months before the December 6, 2019 discovery deadline. The Court granted KMT an extension of time until November 8, 2019, to respond to the motion. At the time KMT requested this extension of time, it assured the Court that a substantially longer extension would not be needed. See Doc. 101, p. 3 ("KMT would not anticipate that the deadline would need to exceed past Nov. 15, 2019 with the discovery deadline being Dec. 6, 2019."). It is now February of 2020, discovery has closed, and KMT has yet to supplement its summary judgment response with further information and proof. Even if the Court were to assume that CLEAResult wrongly withheld from KMT the names of the other contractors involved in the HPwES program, the Court cannot imagine how such information would be material with respect to Count 2. In order to survive summary judgment on this claim, KMT would need to establish that it had a valid contractual relationship and/or business expectancy

---

[6] Obviously, KMT's argument that CLEAResult *was not* a party to the Agreement with respect to Count 2 cuts against its argument that it *was* a party to the Agreement for purposes of the breach of contract claim in Count 8.

15

that was intentionally and wrongly interfered with by CLEAResult, resulting in damages. The names of the other contractors who worked on the HPwES project are irrelevant in establishing any of the four essential elements of this tort. In other words, knowing which contractors worked on the project at the same time as KMT and after KMT was fired, as well as the performance ratings CLEAResult gave these contractors as compared to KMT, will not help KMT prove (1) that it had a valid contract or business expectancy with another energy provider or (2) that CLEAResult interfered in that relationship.

The next matter to take up is whether, as a matter of law, CLEAResult tortiously interfered with the Agreement itself. KMT seems to believe that there is a meaningful distinction between being a party to the Agreement and an agent to a party to the Agreement. The distinction is immaterial here. "It is well settled that a party to a contract, *and its agents acting in the scope of their authority*, cannot be held liable for interfering with the party's own contract." *St. Joseph's Reg'l Health Ctr. v. Munos*, 326 Ark. 605, 614 (1996) (emphasis added). To hold otherwise "would be anomalous . . . when liability does not attach to the principal for the same tort committed on his behalf and presumably for his benefit." *Id.* (quotation and citation omitted). The only way in which an agent could be liable for tortious interference with its principal's contract is if there were evidence that the agent acted "outside [its] authority for a disclosed principal." *Hart v. Bridges*, 30 Ark. App. 262, 271 (1990). Here, KMT has offered no evidence that CLEAResult acted outside the authority that AEP-SWEPCO granted it to administer the HPwES program. This is surely because, under the Agreement's clear terms, CLEAResult was empowered by AEP-SWEPCO to "administer[] the Residential Program . . . on behalf of [AEP-SWEPCO]." (Doc. 35-1, p. 4). This meant selecting contractors, evaluating their work,

16

and deciding whether or not to renew their contracts. The Agreement does not include a specific termination date but provides that it may be terminated "at any time" subject to notification in writing. *Id.* at p. 5.

KMT also does not dispute that as a condition of its continued participation in the HPwES program, it was required to submit an RFQ and associated paperwork every year that it desired to remain a contractor on the project. KMT was aware that CLEAResult evaluated all the RFQs as Administrator of the program. After reviewing all the evidence of record, the Court concludes that KMT has failed to raise a triable question of fact that its contractual relationship with AEP-SWEPCO—or with AEP-SWEPCO's agent, CLEAResult—created an expectancy of a future contractual or business relationship or that CLEAResult, outside the scope of its agency, improperly interfered with the contractual relationship between KMT and AEP-SWEPCO.[7]

---

[7] KMT devotes a good chunk of its brief to explaining why it believes it should not have been fired by CLEAResult. KMT claims that it was a quality contractor, performing quality work—and thus did not deserve to be terminated from the HPwES project. *See, e.g.*, Doc. 115, p. 12 ("KMT maintains it was one of the most qualified contractors as is evidenced by its continuing operation under that program from year to year to year, and the multiple awards it received . . . ."). Apparently, the tortious interference claim KMT makes against CLEAResult and AEP-SWEPCO—at least with respect to a future business expectancy with AEP-SWEPCO in Arkansas—hinges on KMT's subjective belief that it was "one of the most qualified contractors," and for that reason alone, was virtually guaranteed to receive future work from CLEAResult and AEP-SWEPCO. *Id.* To reiterate the point, KMT observes that "[n]o evidence has been presented that KMT was *not* one of 'the most qualified contractors . . . .'" *Id.* (emphasis in original). KMT fails to appreciate the fact that CLEAResult and AEP-SWEPCO were not contractually bound to continue doing business with KMT, regardless of KMT's own belief in the quality of its services and regardless of any objective proof in the form of industry awards and accolades. Further, there is no evidence that KMT's efforts to please CLEAResult and AEP-SWEPCO by performing repairs at Oak Creek (at KMT's expense) somehow modified the Agreement's express terms so as to create a guarantee of future work. The Agreement obligated KMT to "make reasonable repairs or corrections to work" "upon request from Sponsor or Administrator" in order to "bring such work up to Program standards." (Doc. 35-1, p. 4, ¶ 13). And the final paragraph of the Agreement explicitly

17

The Court now turns to KMT's final argument: that it had valid contracts as well as future business expectancies with third-party energy providers, and CLEAResult tortiously interfered with those contracts and expectancies. The Court finds that KMT has provided at least some evidence, in the form of a declaration by a KMT employee and an email, that it had contracts or valid business expectancies with certain third-party companies in Louisiana, Texas, and Arkansas, including HPwES–Texas, Home Energy Savings, AEP-SWEPCO Residential Solutions, Residential Standard Offer Program, Small Business Direct Install Program, Commercial Solutions, and Commercial Standard Offer Program. *See* Doc. 114-32, p. 3; Doc. 114-22. However, the only evidence KMT offers to prove that CLEAResult intentionally interfered in these contracts or expectancies is an email between a manager of AEP-SWEPCO–Texas, Debra Miller, and a manager of AEP-SWEPCO–Arkansas, Sherry McCormack, in which Ms. Miller solicited AEP-SWEPCO–Arkansas's opinion regarding KMT's and another contractor's quality of work. (Doc. 114-25). As previously explained in the discussion on defamation, Section III.A.,

---

stated that no modification of the contract's terms would be binding "unless it is contained in writing signed by both Parties." *Id.* at p. 5, ¶ 23. Moreover, KMT does not dispute that it signed off on a Corrective Action Form (Doc. 36-1) in which it admitted that it "did not fully vet [the] condition of [the] property and its preexisting conditions prior to work start [at Oak Creek], up-to-and-including: damaged, nonexistent, or compromised underbellies; damaged, nonexistent, or compromised insulation in underbellies; distance between ground and floor; existence of standing water due to property being placed on flood plain; presence of uninsulated duct systems; the impact of units sized for a different weather zone (oversized)." *Id.* at pp. 5–6. KMT also admitted with respect to its work on the Oak Creek project that it had "[a]n overall lack of training and adherence to BPI standards" which resulted in "extensive floor damage" and "a poor customer experience and expensive repairs incurred by customers." *Id.* In sum, the Court finds that even if KMT received the highest scores of any contractor working with CLEAResult in 2017, CLEAResult would have still retained the right to decline to do business with KMT in 2018 under the authority given it by AEP-SWEPCO and according to the clear terms of the parties' Agreement. Although this might strike KMT as unfair, it is not a tortious act.

18

*supra*, Ms. McCormack referred the request to CLEAResult manager Jacob Nielson for a response and then forwarded Mr. Nielson's email to Ms. Miller. *Id.*

The Court finds that this email cannot establish competent evidence of tortious interference with a business expectancy. In addition to establishing the four elements of the tort, Arkansas law requires that the interfering conduct "be at least 'improper.'" *Baptist Health v. Murphy*, 373 S.W.3d 269, 282 (Ark. 2010). To determine whether conduct that potentially interferes with a business expectancy is improper, a court must take into account the nature of the conduct, the motive of the actor, the interests of the other with whom the actor's conduct interferes, the interests sought to be advanced by the actor, the social interests in protecting the freedom of action of the actor and the contractual interests of the other, and the proximity or remoteness of the actor's conduct to the interference and the relations between the parties. *Id.* In light of these factors, there is no genuine, material dispute of fact that an email authored by a CLEAResult employee, directed to an AEP-SWEPCO employee in another state, and reviewing the performance of a contractor qualifies as "improper," particularly in light of the fact that the AEP-SWEPCO employee *solicited* the review and, nine months prior to the date of the email, the contractor in question signed a document (Doc. 36-1, p. 2) admitting responsibility for damage sustained by an AEP-SWEPCO customer.

Other than the email referenced above, there is no other proof in the record that CLEAResult intentionally interfered with any of KMT's third-party contracts or business expectancies. KMT merely speculates that CLEAResult *must have said something to someone* because KMT believes it was blacklisted across a three-state region and lost the majority of its energy-efficiency customers after CLEAResult terminated its business

19

relationship. As speculation alone is insufficient to create a triable issue of fact for the jury at the summary judgment phase of litigation, *see Doe v. Dep't of Veterans Affairs*, 519 F.3d 456, 460 (8th Cir. 2008), KMT's tortious interference claim is **DISMISSED WITH PREJUDICE** as to Separate Defendant CLEAResult.[8]

## 2. Interference by Oak Creek/Hickey/Smith

Oak Creek, Hickey, and Smith argue in their motion for summary judgment on Count 2 that they were not parties to the Agreement between KMT, AEP-SWEPCO, and CLEAResult, and were not the "decisionmakers" with respect to the hiring and firing of contractors. They claim that they are not responsible for KMT's termination from the HPwES program after 2017. Though they admit they complained of damage to certain units in the mobile home park and submitted an invoice to AEP-SWEPCO for the cost of repairs, they contend they had no input into how AEP-SWEPCO and/or CLEAResult would pay the invoice.

KMT responds that Oak Creek/Hickey/Smith's complaints about damage to the mobile homes "set into motion actions that continued to snowball out of control until KMT, standing at the bottom of the hill, was finally crushed." (Doc. 188, p. 18). KMT blames Oak Creek/Hickey/Smith for causing it to lose its contract with AEP-SWEPCO in Arkansas

___

[8] Though AEP-SWEPCO has not moved for summary judgment on this claim, there is no evidence of record that would indicate AEP-SWEPCO tortiously interfered with KMT's contracts or business expectancies with third parties—just as there is no evidence that CLEAResult committed the same tort. As explained above, it is legally impossible for AEP-SWEPCO to have tortiously interfered with its own contract with KMT. Therefore, the Court intends to issue a separate order giving AEP-SWEPCO and KMT notice under Federal Rule of Civil Procedure 56(f) that the Court plans to dismiss Count 2 against AEP-SWEPCO with prejudice. In that same order, the Court will offer the parties an opportunity to respond and point to evidence in the record that is relevant to summary judgment.

and be denied future opportunities to participate in weatherization work in other states. KMT's specific assertion is that it was blacklisted in the industry as a result of what happened at Oak Creek.

The Court finds that there is no competent evidence in the summary judgment record that Oak Creek/Hickey/Smith intentionally interfered with KMT's valid contract with AEP-SWEPCO and CLEAResult or with any other valid business expectancy. Oak Creek/Hickey/Smith complained about damage to their mobile home units and maintained that the damage was caused by the weatherization work performed pursuant to the HPwES program. KMT does not dispute that the mobile home floors were damaged; instead it maintains that the damage was not KMT's fault. It insists that there was "not anything inherently wrong with the work performed by KMT" and directs the blame to the "design[ers] [of] the program." (Doc. 188, p. 16).

The facts are undisputed that AEP-SWEPCO, through its Administrator, CLEAResult, received notice of damage to property at Oak Creek and then directed KMT to perform the remedial work. According to KMT, AEP-SWEPCO and CLEAResult also required KMT to foot the bill for continuing repairs. There is no evidence in the record that Oak Creek/Hickey/Smith demanded that KMT be fired or that they complained to any other business entity either employing KMT or considering employing KMT about KMT's poor performance at Oak Creek. Accordingly, as there is no evidence of intentional interference inducing a breach of an actual or prospective business relationship, Count 2 as to Oak Creek/Hickey/Smith is **DISMISSED WITH PREJUDICE**.

## C. Count 3: Unjust Enrichment (AEP-SWEPCO's Doc. 138; CLEAResult's Doc. 145;[9] Oak Creek/Hickey/Smith's Doc. 162)

In Arkansas, "an action based on unjust enrichment is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain." *El Paso Prod. Co. v. Blanchard*, 371 Ark. 634, 646 (2007). However, when an express contract exists, then an aggrieved party to the contract cannot plead unjust enrichment in an effort to circumvent the contract unless the contract is void or does not provide a full opportunity for relief. *See Campbell v. Asbury Auto., Inc.*, 381 S.W.3d 21, 23 (Ark. 2011) (citing 1 HOWARD W. BRILL, ARK. LAW OF DAMAGES § 31:2 (5th ed. 2010)). Here, it appears KMT has pleaded both unjust enrichment and breach of contract against AEP-SWEPCO, a party to the express Agreement involving KMT, and against CLEAResult, AEP-SWEPCO's designated agent. KMT has failed to explain why full relief may not be had against both parties through its breach of contract claim. Therefore, the Court finds that summary judgment is properly granted to CLEAResult and AEP-SWEPCO on Count 3 and is **DISMISSED WITH PREJUDICE** as to these two parties.

Oak Creek, Hickey, and Smith were not parties to an express contract with KMT. The Court finds that there is a genuine, material dispute of fact as to whether Oak Creek/Hickey/Smith were unjustly enriched in the form of money and/or services provided to them by KMT. Accordingly, Count 3 will be preserved for trial against Oak Creek/Hickey/Smith.

---

[9] The Court **GRANTS** CLEAResults Motion (Doc. 145) requesting to join in AEP-SWEPCO's Motion for Summary Judgment as to Counts 1, 3, 4, 6, and 9 (Doc. 138).

### D. Count 4: Fraud (AEP-SWEPCO's Doc. 138; CLEAResult's Doc. 145; Oak Creek/Hickey/Smith's Doc. 162)

A fraud claim under Arkansas law must satisfy the following elements: "(1) a false representation, usually of a material fact; (2) knowledge or belief by the defendant that the representation is false; (3) intent to induce reliance on the part of the plaintiff; (4) justifiable reliance by the plaintiff; and (5) resulting damage to the plaintiff." *Allen v. Allison*, 356 Ark. 403, 418 (2004).

#### 1. AEP-SWEPCO's Motion (joined by CLEAResult)

KMT asserts that there are two false representations that AEP-SWEPCO and CLEAResult made to KMT that KMT relied on to its detriment. The first was that KMT was to blame for the damage sustained at Oak Creek, so it was appropriate to require KMT to pay Oak Creek's invoice for repairs and also foot the bill for other repair work. KMT argues that it was not, in fact, to blame for the damage at Oak Creek—and AEP-SWEPCO and CLEAResult knew it. KMT claims it relied on this "lie" about its liability for damages to its detriment and ended up paying half of Oak Creek's invoice and several other costs of repair, as well.

There are two problems with KMT's first fraud claim. First, there is evidence in the record that KMT claimed responsibility for the damage at Oak Creek—which would make the statement in question true, rather than false. Second, there is no evidence in the record that KMT was somehow duped into believing it was liable for damages and agreed to pay for repairs in reliance on this alleged "lie." During the time period in question, KMT admitted that certain mobile homes had sustained flooring damage and that KMT's failure to properly vet the condition of the property on the front end was at least partly to blame for the damage that resulted. *See* Corrective Action Form, Doc. 36-1 (containing

23

admissions by KMT that its multiple failures caused damage to the flooring of mobile homes at Oak Creek). In addition, KMT questioned whether it was to blame for all the costs associated with damage at Oak Creek, and KMT complained to AEP-SWEPCO about Oak Creek's invoice and the burden of footing the bill for repairs at Oak Creek. Jared Smith, the general manager of KMT, admitted in his Affidavit that "KMT did not believe it did anything wrong" but "nonetheless performed the work required." (Doc. 184-13, pp. 3–4). No detrimental reliance is established, and the first statement cited by KMT cannot form the basis for a fraud claim.

KMT's second example of fraud relates to the "false promises" that AEP-SWEPCO's and CLEAResult's employees allegedly made to KMT "to induce it to make repairs at Oak Creek . . . ." (Doc. 188, p. 21). KMT argues generally that AEP-SWEPCO assured KMT that it would remain a contractor on the HPwES project before the Oak Creek debacle, and, in reliance on that assurance, KMT opened an office in Fayetteville and made large capital expenditures, including buying an insulation machine.

The Court finds that if AEP-SWEPCO and CLEAResult affirmatively promised that KMT's contract term would be renewed if it performed repairs at Oak Creek—which is in dispute—then, in any event, KMT was not justified in relying on that promise. As explained previously, *see supra*, Section III.B.1, according to KMT's Agreement with CLEAResult (as agent for AEP-SWEPCO), the contractual relationship between Contractor and Administrator could be terminated "at any time." (Doc. 35-1, p. 5); *see also* Dep. of Brad Warren, Doc. 187-7, p. 3 (acknowledging that KMT's business relationship with AEP-SWEPCO lasted for a period of years, but that the Agreement was a "one year contract" subject to renewal).

KMT, along with all the other approved contractors, was required to submit an RFQ and associated paperwork *every year*, and CLEAResult retained "the sole right and authority to determine acceptance of Contractor's Application and resulting right of participation in the Program." (Doc. 35-1, p. 4, ¶ 7). There is no evidence in the record to show that alleged statements made by AEP-SWEPCO and/or CLEAResult about the likelihood of renewing KMT's contract either (1) modified the express terms of the Agreement or (2) created a new, legally enforceable contract. In fact, paragraph 23 of the Agreement explicitly provides that "[n]o modification or waiver of any provision shall be binding unless it is contained in writing signed by both Parties." *Id.* at p. 5, ¶ 23. And here, KMT has offered no proof that a written modification to the Agreement regarding the promise of future work was ever signed by the parties. The Court therefore concludes that KMT was not justified in relying on a promise of future work. Count 4 as to AEP-SWEPCO and CLEAResult is **DISMISSED WITH PREJUDICE**.

## 2. Oak Creek/Hickey/Smith's Motion

KMT asserts that Oak Creek/Hickey/Smith lodged false complaints about damage to the flooring in the mobile homes, knowing all the while that the flooring problems "were not all related to the energy efficiency work." (Doc. 188, p. 21). Next, KMT contends that the invoice Oak Creek submitted to AEP-SWEPCO for payment was itself fraudulent in that it included multiple false charges that were unrelated to any damage caused by KMT.

There is evidence in the summary judgment record to suggest that some of Oak Creek's complaints about damage were knowingly and materially false. The question is whether KMT believed these false statements and justifiably incurred costs as a result. After considering the evidence, the Court concludes that it was neither reasonable nor

25

justifiable for KMT to incur costs in reliance on Oak Creek/Hickey/Smith's representations about the cause of the flooring damage. This is because KMT admits that it knew at the time that Oak Creek's representations were false and that KMT was not entirely to blame. Still, KMT made the repairs that were requested and did so in the hope that AEP-SWEPCO and CLEAResult would notice KMT's willingness to perform repairs and decide to renew the Agreement for another year.[10] Mr. Smith of KMT stated in his Affidavit that "[i]n performing the flooring repairs, *KMT realized that the problems complained of were not due to the program*, but were the result of faulty maintenance at the park." (Doc. 184-13, p. 4 (emphasis added)).

In view of KMT's admitted knowledge of the allegedly untrue statements that Oak Creek/Hickey/Smith made about the extent and cause of the damage at the mobile home park, it is clear that KMT could not have justifiably relied on the statements—including those contained within the invoice—to its detriment. Without the element of justifiable reliance, the tort of fraud cannot be sustained. Partial summary judgment is granted and Count 4 is **DISMISSED WITH PREJUDICE** as to Oak Creek/Hickey/Smith.

### E. Count 5: Breach of Fiduciary Duty (CLEAResult's Doc. 155)

Count 5 alleges that a fiduciary relationship was created between AEP-SWEPCO/CLEAResult and KMT, despite the fact that KMT agreed it would serve as an independent contractor on the HPwES program. KMT maintains that once Mr. Hickey and Mr. Smith at Oak Creek started complaining about the work KMT performed, CLEAResult stepped in and took a firmer hand in directing KMT on how to fix the damage.

---

[10] As previously discussed, there was no reasonable legal basis for KMT to expect that its contract would be renewed.

26

As a result, KMT believes "CLEAResult destroyed the employer/independent [contractor] relationship due to CLEAResult's 'direction of means and methods of producing physical results at the senator's business property.'" (Doc. 173, p. 9 (citing Doc. 25, ¶ 100)).

The Court is not convinced that KMT's independent-contractor status was destroyed simply because CLEAResult assumed a more direct role in managing the clean-up and repair of flooring damage that KMT admitted—at least at the time—that it had caused. But even if the Court were to assume that the relationship did transform from that of employer-independent contractor into employer-employee, KMT has failed to establish any genuine, material dispute of fact that CLEAResult thereby owed KMT certain fiduciary duties—and then breached them. If, indeed, the parties entered into an employer-employee relationship at some point, KMT offers no reason to think that CLEAResult owed KMT extra duties not ordinarily observed in a traditional employment relationship, such as the duty of good faith and fair dealing, the duty to not interfere with work, the duty of good conduct, or the duty of continued employment. KMT points to no evidence that it offered CLEAResult consideration in exchange for those extra fiduciary duties.

The Arkansas Supreme Court has held that when parties to an agreement promise to perform certain acts, no particular relationship of trust or confidence necessarily develops because of that agreement. For example, a promise by one party to pay for work undertaken by another party "does not transform a relationship into one that is fiduciary in nature." *Evans Indus. Coatings, Inc. v. Chancery Court of Union Cnty.*, 315 Ark. 728, 734 (1994); *see Geovera Specialty Ins. Co. v. Graham Rogers, Inc.*, 2008 WL 2704651, at *3 (E.D. Ark. July 7, 2008) (finding no authority to impose a fiduciary duty of

good faith and fair dealing "based purely on a contractual relationship"). The relationship between CLEAResult and KMT was no different than the contractual relationships in *Evans* and *Geovera*. As Count 5 is meritless, it is **DISMISSED WITH PREJUDICE** as to CLEAResult.[11]

## F. Count 6: Violations of the ADTPA (AEP-SWEPCO's Doc. 138; CLEAResult's Doc. 145; Oak Creek/Hickey/Smith's Doc. 162)

The elements of an ADTPA violation are: "(1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act." *Skalla v. Canepari*, 430 S.W.3d 72, 82 (Ark 2013). The facts that KMT relies on to prove a violation of the ADTPA are the same as those it uses in support of its defamation and fraud claims.

KMT asserts that the other parties violated the ADTPA "by telling known falsehoods about KMT's work or exaggerating the damages [they] allege[d] were caused by KMT." (Doc. 188, p. 23). The ADTPA, at Ark. Code Ann. § 4-88-107(a), defines deceptive and unconscionable trade practices to include:

(1) Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model; and

(2) Disparaging the goods, services, or business of another by false or misleading representation of fact.

---

[11] As with Count 2, AEP-SWEPCO, for whatever reason, failed to move for summary judgment as to Count 5. Since AEP-SWEPCO is in exactly the same legal position as its agent, CLEAResult, with respect to the allegations in Count 5, the Court finds that the claim should be dismissed as to AEP-SWEPCO as a matter of law for the same reasons it was dismissed as to CLEAResult. Accordingly, the Court will, in a separate order, give AEP-SWEPCO and KMT notice under Rule 56(f) that the Court intends to dismiss the claim and will offer the parties an opportunity to respond.

28

After considering the parties' arguments, the Court finds that the ADTPA claim must be dismissed. KMT has failed to assert any facts to show that AEP-SWEPCO, CLEAResult, Oak Creek, Hickey, or Smith committed a deceptive *consumer-oriented* act. The ADTPA is meant to protect consumers, and KMT has only alleged facts to indicate that these other parties disparaged KMT *to one another*—and not to any members of the consuming public. Though KMT asserts that it was blacklisted in the region after being terminated by AEP-SWEPCO, it cannot offer any proof that the parties it accuses of violating the ADTPA actually made disparaging or false statements about it to other consumers. Finally, if KMT contends that the decision not to renew the Agreement for 2018 somehow hurt the public at large by depriving them of KMT's contractor services, such a claim is simply a bridge too far, and no facts exist to support it. Accordingly, Count 6 is **DISMISSED WITH PREJUDICE** as to all parties.

## G. Count 7: Violations of the AUPA

Only AEP-SWEPCO and CLEAResult have been accused of violating the AUPA in Count 7. However, neither party has moved for summary judgment on this claim. The only information the Court has gleaned regarding this Count comes from KMT's Amended Answer, Third-Party Complaint, Crossclaims, and Counterclaims (Doc. 35). In that pleading, KMT asserts that AEP-SWEPCO and CLEAResult violated the AUPA at Ark. Code Ann. § 4-75-208 by "ma[king] secret, unnecessary and improper payments to Oak Creek, Senator Hickey, and Richard Smith; thereafter requiring KMT reimburse it for the same, and thereafter requiring special services by KMT to Oak Creek, to which no other patron upon like terms and conditions would have received." (Doc. 35, p. 24, ¶ 111).

According to Section 4-75-202 of the AUPA, the purpose of this law "is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented." Ark. Code Ann. §4-75-202. In keeping with the AUPA's focus on anticompetitive behavior, Section 4-75-208 makes illegal the "secret payment or allowance of rebates, refunds, commissions, or unearned discounts . . . to certain purchasers" in a manner "not extended to all purchasers purchasing upon like terms and conditions *to the injury of a competitor*." (emphasis added). Essentially, this section of the AUPA prohibits the act of commercial bribery; but provides that only "a competitor" to the party making the bribe has standing to assert the claim. Here, KMT alleges that AEP-SWEPCO and CLEAResult offered a secret benefit or extra payment to Oak Creek/Hickey/Smith that it did not offer to other customers and that resulted in injury to KMT. Even if true, such an act would not violate this provision of the statute because AEP-SWEPCO and CLEAResult were not KMT's competitors. Accordingly, the Court in a separate order will give notice to the parties under Rule 56(f) that it intends to dismiss Count 7.

### H. Count 8: Breach of Contract (CLEAResult's Doc. 152 and AEP-SWEPCO's Doc. 135)

In Count 8, KMT asserts that it had a valid and enforceable contract with CLEAResult and AEP-SWEPCO, that KMT performed all of its obligations under the contract, and that CLEAResult and AEP-SWEPCO failed to pay KMT in full for its services by deducting half the value of the invoice submitted by Oak Creek ($9,308.36) from KMT's pay and by forcing KMT to assume the costs of additional repair work even though KMT was not at fault for damages. "In order to prove a breach-of-contract claim, one must

30

prove the existence of an agreement, breach of the agreement, and resulting damages." *Jones v. John B. Dozier Land Tr.*, 511 S.W.3d 869, 873 (Ark. Ct. App. 2017).

CLEAResult does not dispute that it entered into a contract with KMT, but for some reason, AEP-SWEPCO does. According to the Agreement (Doc. 35-1), AEP-SWEPCO is clearly identified as "Sponsor," KMT is identified as "Contractor," and CLEAResult is identified as "Administrator." (Doc. 35-1, p. 4). The Agreement states: "Contractor is an independent contractor in relation to Administrator and Sponsor, and is voluntarily participating in the Program to deliver the services as outlined in the Program Manual directly to Sponsor's customers ("Customer")." *Id.* at ¶ 2. Further, the Agreement explicitly provides that AEP-SWEPCO, as "Sponsor," will make incentive payments to KMT in exchange for KMT's installation of "measures" or "services" designed to fulfill the goals of the HPwES "Program." *Id.* Finally, the Agreement contemplates that AEP-SWEPCO and CLEAResult will perform "random field inspections" of KMT's work, and if they deem that "repairs or corrections to work" are needed "to bring such work up to Program standards," then, "upon request from Sponsor or Administrator, and at no additional cost to the customer," KMT will perform the repair work. *Id.* at ¶ 13.

The Court finds that KMT and AEP-SWEPCO entered into a contract. The Court further finds that genuine, material disputes of fact remain as to whether CLEAResult and AEP-SWEPCO breached the Agreement by wrongfully withholding payments that KMT earned for services rendered or by wrongfully requiring that KMT pay for certain costs of repair that were not attributable to KMT's negligence. For these reasons, summary judgment as to Count 8 is **DENIED** as to CLEAResult and AEP-SWEPCO.

31

## I. Count 9: Conspiracy (AEP-SWEPCO's Doc. 138; CLEAResult's Doc. 145; Oak Creek/Hickey/Smith's Doc. 162)

KMT's final claim is that of common-law civil conspiracy. The Arkansas Supreme Court has explained this cause of action as follows:

> To prove a civil conspiracy, a plaintiff must show that two or more persons have combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, but by unlawful, oppressive or immoral means, to the injury of another. A civil conspiracy is not actionable in and of itself, but a recovery may be had for damages caused by acts committed pursuant to the conspiracy. A civil conspiracy is an intentional tort that requires a specific intent to accomplish the contemplated wrong.

*Ballard Grp., Inc. v. BP Lubricants USA, Inc.*, 436 S.W. 3d 445, 455 (Ark. 2014) (internal citations omitted). In the case at bar, KMT alleges that all other parties conspired together in some form or fashion to commit the intentional torts KMT listed in its counterclaims, crossclaims, and third-party claims. It is impossible for CLEAResult to have conspired with AEP-SWEPCO, as they stand in a principal-agent relationship. *See Dodson v. Allstate Ins. Co.*, 47 S.W.3d 866, 876 (Ark. 2001). It is also impossible for Oak Creek, Hickey, and Smith to have conspired with one another, since Hickey and Smith are principals of Oak Creek. *See id.*

Fundamentally, a civil conspiracy is an agreement to commit a tort. To the extent KMT contends that CLEAResult and Oak Creek, separately or together, conspired with Oak Creek/Hickey/Smith to commit a tort, this Order dismisses all tort claims against Oak Creek, Hickey, and Smith. Count 9 is, therefore, **DISMISSED WITH PREJUDICE as to all parties**.

## IV. CONCLUSION

In summary, KMT's claims against AEP-SWEPCO are dismissed on summary judgment with the exception of Count 2 (intentional interference with contract/business expectancy), Count 5 (breach of fiduciary duty), Count 7 (violations of the AUPA), and Count 8 (breach of contract). As the Court indicated, however, it intends to dismiss Counts 2, 5, and 7 as a matter of law against AEP-SWEPCO pursuant to Rule 56(f) and will issue a separate order to that effect. The Court anticipates that the only claim by KMT that will remain for trial against AEP-SWEPCO is Count 8.

As for CLEAResult, only Counts 7 and 8 remain pending after this Order. However, the Court intends to dismiss Count 7 under Rule 56 for the reasons discussed above and will issue a separate order to that effect. The Court anticipates that the only claim by KMT that will remain for trial against CLEAResult is Count 8.

As for Oak Creek/Hickey/Smith, the only claim by KMT that will remain for trial is Count 3 (unjust enrichment).

In view of how few of KMT's claims will remain for trial, the Court is not inclined to bifurcate them from the affirmative claims asserted by Oak Creek. However, the Court will formally address the matter of bifurcation in a separate order.

**IT IS THEREFORE ORDERED** as follows:

- CLEAResult's Motion for Partial Summary Judgment (Doc. 92) is **GRANTED**;
- AEP-SWEPCO's Motion for Partial Summary Judgment (Doc. 135) is **DENIED**;

- AEP-SWEPCO'S Motion for Partial Summary Judgment (Doc. 138) is **GRANTED**;

- CLEAResult's Motion to Adopt AEP-SWEPCO's Motion for Partial Summary Judgment (Doc. 145) is **GRANTED**;

- CLEAResult's Motion for Partial Summary Judgment (Doc. 146) is **GRANTED**;

- CLEAResult's Motion for Partial Summary Judgment (Doc. 152) is **DENIED**;

- CLEAResult's Motion for Partial Summary Judgment (Doc. 155) is **GRANTED**; and

- Oak Creek/Hickey/Smith's Joint Motion for Summary Judgment is **GRANTED IN PART** as to Counts 1, 2, 4, 6, and 9 and **DENIED IN PART** as to Count 3.

**IT IS SO ORDERED** on this ___ day of February, 2020.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE